# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

POGHOS KAZARIAN,
            *Plaintiff-Appellant,*

            v.

US CITIZENSHIP AND IMMIGRATION
SERVICES, a Bureau of the
Department of Homeland Security;
DOES, 1 through 10,
            *Defendants-Appellees.*

No. 07-56774

D.C. No.
CV-07-03522-R-E

OPINION

Appeal from the United States District Court
for the Central District of California
Manuel L. Real, District Judge, Presiding

Argued and Submitted
December 9, 2008—Pasadena, California

Filed September 4, 2009

Before: Harry Pregerson, Dorothy W. Nelson and
David R. Thompson, Circuit Judges.

Opinion by Judge D.W. Nelson;
Dissent by Judge Pregerson

12411

## COUNSEL

Ruben N. Sarkisian, Glendale, California, for the plaintiff-appellant Poghos Kazarian.

Craig W. Kuhn and Elizabeth J. Stevens, Office of Immigration Litigation, Department of Justice, Washington D.C.; for the defendant-appellee U.S. Citizenship & Immigration Services.

## OPINION

D.W. NELSON, Senior Circuit Judge:

Poghos Kazarian appeals the District Court's grant of summary judgment to the United States Citizenship and Immigration Service ("USCIS"), finding that the USCIS's denial of an "extraordinary ability" visa was not arbitrary, capricious, or contrary to law. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

On December 31, 2003, Poghos Kazarian, a thirty-four-year-old native and citizen of Armenia, filed an application for an employment-based immigrant visa for "aliens of extraordinary ability" (Form I-140) contending that he was an alien with extraordinary ability as a theoretical physicist.

Kazarian received a Ph.D in Theoretical Physics from Yerevan State University ("YSU") in Yerevan, Armenia, in 1997. From 1997 to 2000, he remained at YSU as a Research Associate, where, among other things, he "reviewe[d] [the] diploma works of the Department's graduates."

At YSU, Kazarian specialized in non-Einsteinian theories of gravitation. According to a colleague, "[t]his work offered a mechanism for the control of solutions' accuracy, which guarantees the accuracy of calculations in many theories of gravitation." Kazarian "solve[d] [the] more than 20 year[ ] old problem of construction of the theory, satisfying the cosmog-

ony conception of worldwide acknowledged scientist, academician V.A. Hambartsumian."

Since 2000, Kazarian has served as a Physics / Math / Programming Tutor, an Adjunct Physics and Mathematics Instructor, and a Science Lecture Series speaker at Glendale Community College ("GCC"). Between 2000 and 2004, however, Kazarian's work at GCC was on a volunteer basis.

In support of his application, Kazarian submitted several letters of reference. The first reference was a letter from Dr. Kip S. Thorne, the Feynman Professor of Theoretical Physics at California's Institute of Technology. Dr. Thorne, who worked in the same research group as Kazarian, stated that he had "formed a good opinion of Dr. Kazarian's research. It is of the caliber that one would expect from a young professor at a strong research-oriented university in the United States." Kazarian also provided letters from professors at YSU, stating that Kazarian "possesse[d] great ability and considerable potency in science," was "a young scientist with enough scientific potential," had "high professionalism," and had "displayed himself as exceptionally diligent, hard-working, [and] highly qualified." Finally, Kazarian submitted three letters from colleagues at GCC praising his hard work and active participation at GCC.

As evidence of publication, Kazarian noted that he had authored a self-published textbook, titled "Concepts in Physics: Classical Mechanics." According to one of his colleagues at GCC, the book "is certain to be required reading in many secondary schools, colleges and universities throughout the country." Kazarian, however, presented no evidence that the book was actually used in any class. Kazarian also submitted two scholarly articles in support of his application in which he was neither the author nor the co-author, nor was his research cited or relied upon; instead, he was acknowledged for his useful scientific discussions. In his resume, he also listed six publications in *Astrophysics*, as well as one e-print.

Finally, Kazarian presented evidence of his Science Lecture Series at GCC. His resume also listed lectures at the 17th and 20th Pacific Coast Gravity Meetings, the Conference on Strong Gravitational Fields at UC Santa Barbara, the 8th International Symposium on the Science and Technology of Light Sources, and the Foundations of Gravitation and Cosmology, International School-Seminar.

In August 2005, the USCIS denied the petition. Kazarian appealed the denial to the Administrative Appeals Office ("AAO"). The AAO found that Kazarian failed to establish any of the necessary criteria for an "extraordinary ability" visa and dismissed the appeal. Having exhausted his administrative remedies, Kazarian filed a complaint in the Central District of California. The District Court granted the USCIS's motion for summary judgment, and Kazarian timely appealed to this court.

## STANDARD OF REVIEW

This court "review[s] the entry of summary judgment *de novo.*" *Family Inc. v. U.S. Citizenship & Immigration Servs.*, 469 F.3d 1313, 1315 (9th Cir. 2006). "However, the underlying agency action may be set aside only if 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' " *Id.* (quoting 5 U.S.C. § 706(2)(A)). "We have held it an abuse of discretion for the Service to act if there is no evidence to support the decision or if the decision was based on an improper understanding of the law." *Tongatapu Woodcraft Hawaii Ltd. v. Feldman*, 736 F.2d 1305, 1308 (9th Cir. 1984) (internal quotations omitted). "The agency's factual findings are reviewed for substantial evidence." *Family*, 469 F.3d at 1315. This court "will not disturb the agency's findings under this deferential standard unless the evidence presented would *compel* a reasonable finder of fact to reach a contrary result." *Id.* (internal quotations omitted).

*DISCUSSION*

A.   THE "EXTRAORDINARY ABILITY" VISA

**[1]** Pursuant to 8 U.S.C. § 1153(b)(1)(A), aliens may apply for a visa on the basis of "extraordinary ability." An immigrant is an "alien with extraordinary ability" if

> (i) the alien has extraordinary ability in the sciences, arts, education, business, or athletics which has been demonstrated by sustained national or international acclaim and whose achievements have been recognized in the field through extensive documentation,
>
> (ii) the alien seeks to enter the United States to continue work in the area of extraordinary ability, and
>
> (iii) the alien's entry into the United States will substantially benefit prospectively the United States.

*Id.*

Only the first factor is at issue in this appeal. Extraordinary ability "means a level of expertise indicating that the individual is one of that small percentage who have risen to the very top of the field of endeavor." 8 C.F.R. § 204.5(h)(2).

An alien can prove an extraordinary ability in one of two ways. The first is "evidence of a one-time achievement (that is, a major, international recognized award." *Id.* § 204.5(h)(3). Receipt of the Nobel prize is the quintessential example of a major award. H.R. Rep. No. 101-723(I & II) (1990), *reprinted in* 1990 U.S.C.C.A.N. 6710, 6739. Kazarian concedes that he has won no such prize.

The second way to prove extraordinary ability is to provide evidence of at least three of the following:

(i) Documentation of the alien's receipt of lesser nationally or internationally recognized prizes or awards for excellence in the field of endeavor;

(ii) Documentation of the alien's membership in associations in the field for which classification is sought, which require outstanding achievements of their members, as judged by recognized national or international experts in their disciplines or fields;

(iii) Published material about the alien in professional or major trade publications or other major media, relating to the alien's work in the field for which classification is sought. Such evidence shall include the title, date, and author of the material, and any necessary translation;

(iv) Evidence of the alien's participation, either individually or on a panel, as a judge of the work of others in the same or an allied field of specification for which classification is sought;

(v) Evidence of the alien's original scientific, scholarly, artistic, athletic, or business-related contributions of major significance in the field;

(vi) Evidence of the alien's authorship of scholarly articles in the field, in professional or major trade publications or other major media;

(vii) Evidence of the display of the alien's work in the field at artistic exhibitions or showcases;

(viii) Evidence that the alien has performed in a leading or critical role for organizations or establishments that have a distinguished reputation;

(ix) Evidence that the alien has commanded a high salary or other significantly high remuneration for services, in relation to others in the field; or

(x) Evidence of commercial successes in the performing arts, as shown by box office receipts or record, cassette, compact disk, or video sales.

8 C.F.R. § 204.5(h)(2).

The "extraordinary ability" visa can be better understood in context. Under the Immigration Act of 1990, thousands of employment-based visas were created according to three employment preferences. Pub. L. No. 101-649, 101 Stat. 4978. "Aliens with extraordinary ability" are "priority workers" and have the first preference. 8 U.S.C. § 1153(b)(1).

"*Extraordinary* ability" is distinct from "*exceptional* ability," however, which receives second preference. *Compare id.* § 1153(b)(1)(A) (emphasis added), *with id.* § 1153(b)(2) (emphasis added).[1] To qualify for the "exceptional ability" visa, a petitioner must make a lesser showing of ability, and need only show three of the following:

(A) An official academic record showing that the alien has a degree, diploma, certificate, or similar award from a college, university, school, or other institution of learning relating to the area of exceptional ability;

(B) Evidence in the form of letter(s) from current or former employer(s) showing that the alien has at least ten years of full-time experience in the occupation for which he or she is being sought;

---

[1]Skilled workers, professionals, and "other workers" make up the third preference. *Id.* § 1153(b)(3).

(C) A license to practice the profession or certification for a particular profession or occupation;

(D) Evidence that the alien has commanded a salary, or other remuneration for services, which demonstrates exceptional ability;

(E) Evidence of membership in professional associations; or

(F) Evidence of recognition for achievements and significant contributions to the industry or field by peers, governmental entities, or professional or business organizations.

8 C.F.R. § 204.5(k)(3)(ii).

**[2]** To qualify for an "exceptional ability" visa, however, the alien must also provide evidence that his services are sought by a United States employer. *Id.* The "extraordinary ability" visa thus has considerable advantages. Unlike the "exceptional ability" visa petition, the "extraordinary ability" petition is not dependent on an actual offer for employment in the United States, and is exempt from the time-consuming labor certification process, which requires that employers first test the marketplace for existing qualified domestic workers. *Compare id.* § 204.5(h)(3)(5), *with id.* § 204.5(k)(4).

**[3]** Interpretation of the statutory and regulatory requirements for the "extraordinary ability" visa presents a question of first impression for this court. The scant caselaw indicates that "[t]he regulations regarding this preference classification are extremely restrictive." *Lee v. Ziglar*, 237 F. Supp.2d 914, 918 (N.D. Ill.2002) (finding that "arguably one of the most famous baseball players in Korean history" did not qualify for the visa as a baseball coach for the Chicago White Sox because his acclaim was limited to his skills as a player and not as a coach); *cf. Grimson v. INS*, 934 F.Supp. 965, 969

(N.D. Ill. 1996) (finding denial arbitrary and capricious where NHL hockey enforcer was one of the top three players in the world and agency improperly discounted the importance of the enforcer position); *Muni v. INS*, 891 F.Supp. 440 (N.D. Ill. 1995) (finding the agency improperly discounted evidence for an NHL hockey player who won the Stanley Cup three times, won "most underrated defenseman," was paid more than the average NHL player, submitted numerous articles establishing his stature in the hockey world, and provided affidavits from eight renowned hockey players stating that he was highly regarded); *Buletini v. INS*, 860 F.Supp. 1222 (E.D. Mich. 1994) (finding denial was arbitrary and capricious where Albanian physician won a national award, published a medical dictionary and numerous articles, was responsible for general health projects, and served as an adjunct professor); *Matter of Price*, 20 I. & N. Dec. 953, 955-56 (BIA 1994) (granting the visa petition to a professional golfer who won the 1983 World Series of Golf and the 1991 Canadian Open, ranked 10th in the 1989 PGA Tour, collected $714,389 in 1991, provided numerous affidavits from well-known and celebrated golfers, and received widespread major media coverage).

### B.  APPLICATION TO KAZARIAN

The AAO found that Kazarian did not meet any of the regulatory criteria. Only four of the ten are at issue in this appeal. We find that substantial evidence supports all of the AAO's findings.

#### 1.  *Participation as a Judge of the Works of Others*

**[4]** In finding that Kazarian did not meet this criterion, the AAO acknowledged that Kazarian had served as a reviewer of diploma works at YSU, but determined that his YSU service was not qualifying evidence, because "[r]eviewing 'diploma works' for fellow students at one's own university is not persuasive evidence of acclaim beyond that university."

Because internal review of students' work fails to establish "sustained national or international acclaim," this finding was not arbitrary, capricious, or contrary to law.

## 2. *Evidence of Original Scientific, Scholarly Contributions of Major Significance in the Field of Endeavor*

The AAO discounted the letters submitted on Kazarian's behalf, noting that they were vague, solicited letters from local colleagues. The letters did not specifically identify contributions nor did they provide specific examples of how those contributions influenced the field.

**[5]** An independent look at the letters reveals that although Kazarian is well-respected by his colleagues, he has not yet attained the stature required by the statutory scheme. Dr. Thorne had "formed a good opinion" of Kazarian, and found him to be "of the caliber that one would expect from a young professor." Evidence that Kazarian had "*enough* scientific potential," however, does not demonstrate that he is in "the top percentage of his field," 8 C.F.R. § 204.5(h)(2).

**[6]** Kazarian's publications and presentations overseas are not to the contrary. There was no evidence that his textbook had been adopted by any schools, and although Kazarian had several publications, there was no evidence that they were of "*major* significance," 8 C.F.R. § 204.5(h)(2)(v) (emphasis added). This does not compel a finding that Kazarian had contributed work of the required caliber.

## 3. *Authorship of Scholarly Articles in the Field*

**[7]** Although Kazarian listed six articles on his resume, there was no evidence in the record that his scholarship was cited by others. In determining that Kazarian did not meet this criterion, the AAO found that "publication of scholarly articles is not automatically evidence of sustained acclaim; we

must consider the research community's reaction to those articles."

**[8]** The question presented here is somewhat closer. Requiring acclaim within the criterion may be circular, because publication, on its own, indicates approval within the community. Because postdoctoral candidates are expected to publish, however, the agency's conclusion that the articles must be considered in light of the community's reaction is not contrary to the statutory mandate that the alien have achieved "sustained national or international acclaim." *See* 8 U.S.C. § 1153(b)(1)(A)(i).

### 4.  DISPLAY of the Alien's Works at Artistic Exhibitions or Showcases

**[9]** Because the plain language of the regulation refers to "artistic exhibitions or showcases" and because evidence of lectures and conference presentations are accounted for in the "authorship of scholarly articles" criterion, the agency correctly held that this criterion did not apply to Kazarian. *See* 8 C.F.R. § 204.5(h)(2)(vi)-(vii).

### CONCLUSION

**[10]** Although Kazarian appears to be a well-respected, promising physicist, who may well have qualified for an "exceptional ability" visa (were he to have established that his services were sought by a United States employer), he is not yet of the caliber that qualifies him as "an alien with extraordinary ability." Accordingly, we AFFIRM the District Court's order.

**AFFIRMED.**

PREGERSON, Circuit Judge, dissenting:

I dissent. Dr. Poghos Kazarian received his Ph.D. in the field of theoretical physics from Yerevan State University and, since arriving in the United States, has continued to research and teach in this challenging field. Dr. Kazarian participated in a research group headed by Dr. Kip Thorne at the California Institute of Technology. Dr. Thorne submitted a letter in support of Dr. Kazarian's visa application. Dr. Kazarian volunteers his teaching services at Glendale Community College and has authored and published his own physics textbook. Dr. Kazarian has received strong words of praise from colleagues at Yerevan State University, Glendale Community College, and the California Institute of Technology. Dr. Kazarian's contributions in the United States have been undoubtedly valuable. Forcing Dr. Kazarian to depart from our country would be undoubtedly wasteful and make one think that there is something haywire in our system.[1]

I also disagree with the majority opinion's interpretation of 8 C.F.R. § 204.5(v). Section 204.5(v) permits an applicant to demonstrate extraordinary ability by showing, as one factor, "[e]vidence of the alien's authorship of scholarly articles in the field, in professional or major trade publications or other major media[.]" In support of his application, Dr. Kazarian offered evidence that he published several articles and pre-

---

[1] At oral argument, Dr. Kazarian's current counsel represented to the court that the attorney who started Dr. Kazarian on the path of applying for this "extraordinary ability" visa was George Verdin. Verdin is listed as being indefinitely suspended from practice before the Immigration Service, the Immigration Courts, and the Board of Immigration Appeals. Executive Office for Immigration Review, Office of General Counsel, List of Currently Disciplined Practitioners (Aug. 11, 2009), http://www.usdoj.gov/eoir/profcond/chart.htm. Verdin has also been disbarred by the Supreme Court of Hawai'i. *Office of Disciplinary Counsel v. Verdin*, No. 22349 (Haw. Sept. 27, 2001). It is distressing how many good people—including the highly educated and the minimally educated —fall prey to disreputable lawyers known to the system.

sented his work at conferences. Nevertheless, the Administrative Appeals Office rejected Dr. Kazarian's evidence, stating that it was the position of the United States Citizenship and Immigration Services ("USCIS") "that publication of scholarly articles is not automatically evidence of sustained acclaim; [USCIS] must consider the research community's reaction to those articles."

As observed by the majority opinion, this extra requirement articulated by the Administrative Appeals Office is circular, because publication itself indicates some approval by the research community. Moreover, the requirement that articles be considered in light of the research community's reaction is nowhere found in the statute or regulations. By its own language, the regulation requires evidence of *authorship* and authorship alone. The plain language of the regulation does not state that an applicant is required to submit evidence of the research community's reaction to the publications. There is not even a suggestion in the regulations as to what such evidence might look like. I do not agree with the majority opinion's conclusion that articles must be considered in light of the research community's reaction to those articles. For all these reasons, I dissent.